# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| v. | § § | SA-17-CR-876-XR |
| DEVANTE FENNELL | § § § | |

## ORDER

The Defendant is charged in this case with violating 18 U.S.C. § 922(g) (felon in possession of a firearm).

## BACKGROUND

In September 2017, due to an outbreak of violence on the east side of San Antonio, the San Antonio Police Department increased patrols in the area. SAPD Officer Raphael Medel and his partner Sergio Villanueva were assigned to patrol the area the evening of September 24, 2017.

The officers encountered Mr. Fennell when he was seen apparently walking across a street ("jaywalking").[1] During the March 21, 2018 hearing on the motion to suppress, the officers testified that they "contacted" him, they ran his name and date of birth for outstanding warrants, became aware that he had outstanding traffic warrants, but inasmuch as they were looking for individuals associated with the recent "shootings," they claimed that chose to merely "cut him loose" rather than arrest him based on the traffic warrants.

---

[1] April 20 Transcript at pp. 3-4.

1

Despite a previous request by defense counsel for body cam video, Officer Villanueva testified that they did in fact wear body cams that evening.[2] The Court ordered production of the body cam and dash cam video. The impression that the officers left with the Court during that first hearing was they had no previous encounters with the Defendant.[3]

During the April 16 hearing it was revealed that the officers had been back up for the Bexar County Deputy Sheriff's office some days prior to September 24, 2017. In that event Bexar County deputies had seen Mr. Fennell exiting a known drug stash house; he was believed to be a member of a local gang and was stopped and found with a large sum of money. Mr. Fennell was ultimately released.

On September 24, 2017, the body cam video[4] indicates that at the 59:30 mark the officers see Mr. Fennell walking on Hays Street[5], they get out of their vehicle and direct him to place his hands on the hood of the police cruiser. He is asked for identification and he tells the officer that he doesn't have any.[6] He is asked if he has any weapons and one of the officers asks if he "could take a look." He is patted down and the Defendant's car key and other items in his pockets are removed. The cam audio does not record the Defendant consenting to the removal of his keys and other items from his pockets.[7] He is placed in handcuffs, examined for gang tattoos, and later placed in the back seat of the patrol vehicle. Once he tells the officers his name and date of birth, Officer Medel inputs data into the Mobile

---

[2] Officer Medel initially testified that he was not wearing a body camera. Officer Medel also testified at the first hearing that the only thing he remembered about the pedestrian stop was that the Defendant had outstanding traffic warrants. April 16 Transcript at p. 37.

[3] The Defendant suggests that law enforcement officers and perhaps Officers Medel and Villanueva have had numerous contacts with him, and that he has been subjected to harassment and racial profiling. April 16 Transcript at pp. 53-55. Officer Medel testified that he has had only three encounters with the Defendant – the assist with Bexar County Sheriff's Deputies, the pedestrian stop and the traffic stop. April 16 Transcript at pp. 46-50.

[4] Government Exhibit 7.

[5] Government Exhibit 9.

[6] The Defendant implies that the officers knew the Defendant was in the area and ran his name on a computer search prior to approaching him at the pedestrian stop. Officer Villanueva states that he only became aware of his name once they made contact. April 20 Transcript at pp. 24, 26.

[7] Government Exhibit 8. Officer Medel testified that the Defendant gave consent to a search of his person. April 16 Transcript at pp. 42-43. Officer Villanueva testified that the Defendant said, "Go ahead" and thereby gave consent to a search of his person. April 19 Transcript at p. 46.

Data Terminal (MDT).[8]  At about the 01:50 mark the MDT returns information on the screen.  At about the 03:17 mark Officer Villanueva begins pressing the Defendant's car key Fob[9] attempting to locate the Defendant's vehicle.  He does this several times over the course of this stop.  Ultimately Officer Villanueva was able to associate a vehicle that responded to the key FOB.[10]  At about the 05:00 mark Officer Medel is seen texting on a cell phone.  For a significant portion of the tape the officers mute their body cam recording device.[11]  At the 10:00 mark the officers begin to question the Defendant as to what he is doing in the area, where his aunt lived, and why he was carrying a large amount of money the other day.  He is released at the 11:30 mark.

Upon his release the Defendant is seen walking on the sidewalk towards his aunt's house farther down Hays Street.[12]  The officers drove by the Defendant's vehicle, a white Ford Fusion, and noted the license plate number.[13]  They testified that they routinely collect such data and transmit this information to the SAPD Intelligence Unit, so in the event something happens in the future they may be able to correlate vehicles and individuals.  The officers deny that they later followed Mr. Fennell in any

---

[8] The Defendant suggests that a name search was performed on him prior to the officers stopping him on the street.  The Defendant argues that a name search was performed at 19:59:29. Officer Medel contends that the only name check that was done on the MDT was after they encountered Mr. Fennell on the street and that the various data reports are not synced with actual time.  April 16 Transcript at p. 41.  It appears that Defense Counsel acknowledges that only one person check is done, followed by a vehicle check.  April 16 Transcript at p. 45.  John Lowrey, a SAPD audio/video records specialist, testified that the various systems used by SAPD are not integrated systems, that it is not unusual for the time stamps to be off, and that in his experience no two systems have ever had the same time stamps.  April 16 Transcript at pp. 8-82.
[9] "An object attached to a key chain or key ring; especially: a small electronic device used typically in place of a key (as to unlock a door or start a vehicle) or to remotely initiate the action of another device (such as a garage door)." "Fob." Merriam-Webster.com. Merriam-Webster, n.d. Web. 28 Apr. 2018.
[10] April 19 Transcript at p. 54.
[11] The Court notes that this happens frequently in cases that are contested.  When issues of privacy arise, it is understandable that the audio is muted, but otherwise it is a problematic practice that raises distrust and suspicion.
[12] Government Exhibit 9.
[13] April 19 Transcript at p. 55.

fashion.[14]  The Defendant speculates that the officers were following him.  He offered various exhibits[15] detailing the route the officers took after the pedestrian stop.

About 14 minutes after Mr. Fennell was released, the officers turn on North Mittman Street.[16] They go around another vehicle that appears either illegally parked in the street, backing up, or sticking out, and stop a white vehicle for failing to stop at a stop sign.[17]  The officers offered no explanation as to why they disregarded this vehicle that was likely in violation of traffic laws, went around the vehicle and followed the white vehicle.  The vehicle is driven by the Defendant, but the officers deny that they knew this when they initiated the stop.  Officer Medel requests that the driver roll down all the windows and asks for his driver's license.  The Defendant responds that "you just pulled me over."  Officer Medel states "I know we did."  The Defendant is asked to step outside of the vehicle and he is placed in handcuffs.[18]  Officer Medel then states in the video that he smells a strong odor of marijuana.[19]  The windows remained rolled down and the doors were opened.  Officer Villanueva begins a search of the vehicle for marijuana, and ultimately locates a weapon on the front passenger side floor.  At about the 57:22 mark, a drug dog is brought to the stop.  The handler opines that the dog had an alert in the console area, but no other drugs or weapons were found inside the vehicle.[20]

Defendant's expert witness, Jerry Potter, is a former dog handler, trainer and kennel master at Lackland AFB, Texas.  He testified that if there was a previous strong odor of marijuana emanating from the vehicle, even 30 minutes later with windows down and doors opened, he would have expected to

---

[14] Government Exhibit 17.  Officer Medel admits that after they drove from the pedestrian stop, they parked their police cruiser about 400 feet from the Defendant's aunt's home.  April 16 Transcript at pp. 65-66.
[15] Defendant's Exhibit 12; April 19 Transcript at pp. 57-61; Docket Entry No. 71.
[16] Government's Exhibit 3.  It is difficult to state with accuracy timing in this case.  The body cams and the MDT are not synced to real time.
[17] At the 8:25:54 PM mark Officer Medel stops a white vehicle.  Gov't Exhibit 5 (substituted version).
[18] Government Exhibit 3.
[19] Officer Villanueva also testified that he smelled marijuana coming from the vehicle when the windows were rolled down.  April 19 Transcript at p. 66.
[20] Government Exhibit 4.

see a change of behavior from the dog as he approached the vehicle to search, and the dog displayed no change in behavior. The Defendant suggests that Officer Medel lied about smelling marijuana as a pretext to initiate a search of the vehicle. SAPD Sergeant Brent Alan Baucum testified that as a supervisor and trainer of the SAPD K-9 unit he has worked extensively with the dog (Speed) who performed the vehicle search in this case. He testified that Speed is trained to detect drug sources, not necessarily residual odors. He further testified that given the lapse of 30 minutes, car windows rolled down and doors open, he would not expect Speed to alert to any odor of marijuana.

Defendant also contests the traffic stop arguing that he indeed did make a complete stop before turning right at Gabriel Street. Jahan Eftekhar, Ph.D., testified that he analyzed 37 seconds of the video in this case and decomposed it into frames of .033 seconds. In all he created over 1100 frames and concluded that although it appears the vehicle never stopped[21], the car indeed stopped for 2.133 seconds.[22] Dr. Eftekhar also testified that it is "absolutely" clear that the vehicle made this stop 9.63 feet beyond the stop sign.[23]

**ANALYSIS**

A. **Although the jaywalking detention was impermissibly extended in both duration and scope, and Officer Villanueva's use of the key Fob was impermissible, no evidence gathered from the pedestrian stop ultimately was used in the later traffic stop**

Apparently acknowledging[24] that jaywalking allows for the stop of a person[25], Defendant concentrates on arguments that the officers asked questions unrelated to the offense of jaywalking (e.g.

---

[21] April 19 Transcript at pp. 30-31.
[22] April 19 Transcript at p. 26. To reach this conclusion required two engineers, one Ph.D., and one staff engineer expending more than 20 hours of work at a cost of about $13,000.
[23] April 19 Transcript at p. 32. The car rolled past the stop sign before it stopped. April 19 Transcript at p. 33.
[24] Although the Defendant acknowledges (by omission of any argument to the contrary) that a *Terry* stop may be made for jaywalking, the Defendant is critical of how law enforcement officers treat Black Americans in poor neighborhoods differently because of their race.
[25] Texas Transportation Code, Sec. 552.006.

patting down for weapons, asking about his aunt's residence, reviewing for gang tattoos, searching for drugs that may have been hidden or discarded). Defendant also argues that the officers impermissibly extended the stop. He asserts that the records check on him was completed at 8:03 p.m., but that he nevertheless was restrained for an additional 8 minutes.

In this case the officers saw a man jaywalking across the street. Contrary to claims made by the Defendant, the officers had not previously conducted a name or vehicle search on the Defendant. Viewing the Defendant jaywalking provided the officers reasonable suspicion that a violation of a traffic law may have occurred. *See United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017). Accordingly, they were authorized to ask the Defendant his name, request that he provide identification, frisk for weapons, and conduct a check for outstanding warrants. *See United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010).

Once they were aware that the Defendant had outstanding warrants, they were authorized to take him into custody or they could have exercised their discretion, not take the Defendant into custody and release him. However, the scope of their questions (directed at suspicious ties to a drug house) was not reasonably related in scope to the circumstances that justified the stop in the first instance (jaywalking). The officers had no specific and articulable facts that the Defendant had or was about to commit any other crime. "Such a belief must be founded on specific and articulable facts rather than on a mere suspicion or 'hunch'." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014).

The Government appears to assert that because the Defendant was walking in a high crime area, this justified prolonging the stop and searching the Defendant's pocket, and pressing on the key Fob to further its investigative fact-gathering. First, the Court concludes that the Defendant did not consent to a search of his pocket after the frisk had been conducted. The officers' changed testimony

that they recall the Defendant authorizing a search is not credible, especially after they initially had claimed no recollection of the pedestrian stop.

Whether the pressing of a key Fob by a police officer is a search or reasonable is unclear. The Eighth Circuit concluded that an officer's pressing of a Fob to identify a defendant's car during the execution of a search warrant did not violate any reasonable expectation of privacy. *United States v. Cowan*, 674 F.3d 947, 956 (8th Cir. 2012).[26] In *United States v. Dasinger*, 650 F. App'x 664, 672 (11th Cir. 2016), the Court assumed the defendant had a privacy interest in the identity of his car, but nevertheless concluded that the police officer's manipulation of the key Fob was not unreasonable because under the totality of the circumstances the officers had a legitimate interest in investigating signs of criminal activity. There does not appear to be any settled law in the Fifth Circuit, but one case appears to allow the taking of keys and pressing on the Fob as reasonable, only if the search was contemporaneous with and incident to a lawful arrest. *United States v. Koehler*, 790 F.2d 1256, 1260 (5th Cir. 1986).

A recent Eighth Circuit opinion has approached the question slightly differently. In finding that the officer's use of the key Fob exceeded the scope of a *Terry* stop and required suppression, the Court concluded that a defendant has a reasonable expectation of privacy in the contents of his pants pockets. *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016).

This Court agrees with the *Craddock* decision that a person has a reasonable expectation of privacy in the contents of his pants pockets. In sum, without the Defendant's consent, Officer Villanueva

---

[26] *See also United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014) ("Neither this circuit nor any other has held that an officer's warrantless activation of a key fob to locate the vehicle to which it corresponds constitutes a search, let alone an unconstitutional one."). Likewise, in an incident to arrest case, a Texas court of appeals has concluded that pressing a key Fob did not violate any reasonable expectation of privacy because a person has no expectation of privacy in the identity of his car that is parked on a public street. *Wiley v. State*, 388 S.W.3d 807, 819 (Tex. App. – Hou. [1st Dist.] 2012, pet. ref'd).

should not have removed the contents of the Defendant's pocket and pressed the key Fob. The notation of the license plate number requires suppression.

B. **Defendant failed to completely stop at a stop sign providing reasonable suspicion to stop his vehicle, but the officers impermissibly tracked the Defendant's car using the knowledge they gained by impermissibly pressing on the key's Fob**

Although the Defendant's vehicle may have indeed stopped for 2.133 seconds, the vehicle made this stop 9.63 feet beyond the stop sign, thus violating Texas Transportation Code, sections 544.010 and 545.151. Accordingly, there was reasonable suspicion that a violation of a traffic law may have occurred. However, the officers followed the Defendant after gaining knowledge of what car he was driving by impermissibly pressing on the key's Fob. Despite their testimony that they were not following the Defendant, the car cam video shows the officers ignoring another car likely violating traffic laws, swerving around that vehicle and focusing on a white car. The body cam shows before they approach the vehicle the officers agree that all the windows need to be rolled down.[27] Officer Medel then approaches the car and asks the Defendant for his driver's license, the Defendant stating that we "just went thru this" and Officer Medel stating "I know we did." Before any mention of the smell of marijuana, the Defendant is asked to step out of the vehicle and handcuffed. He is then questioned about why he was in this intersection, when the officers were previously told about his aunt's house. All this occurs before Officer Medel states that the car smells like there is "weed" in there. Immediately upon hearing "weed" Officer Villanueva immediately opens the passenger door and begins searching.

C. **Defendants argument that the officers did not in fact smell marijuana at the traffic stop**

Defendant asserts that the officers did not in fact smell marijuana when they made the traffic stop for rolling past the stop sign. Defendant contends that the officers' statements should not be given any credibility because of their previous misrepresentations during the first hearing. As indicated above,

---

[27] Government Exhibit 3.

the Court concludes that the officers tracked the Defendant's car. The Court further finds that the officers' testimony is not credible that they smelled marijuana coming from the car.

The audio associated with the body cam video clearly indicates Officer Medel telling the driver he smells marijuana coming from the car only after he has placed the Defendant in handcuffs and questioned why he was at that intersection, when the officer thought he was previously headed to another location. Although about thirty minutes later the dog handler in the video is clearly heard stating that the dog had an alert in the console area of the car, no actual marijuana was located. Although it remains a possibility that with the time elapse, car windows rolled down and doors opened, any odor dissipated, it appears remarkable that at no time during his search does Officer Villanueva say anything further about the smell of marijuana. Officer Villanueva only expresses an utterance when he finds the gun in the car. Thereafter, the audio is again muted. At no audible point during the remainder of the body cam[28], including the K-9 search, do any of the police officers ever again mention that they smelled marijuana, or express surprise that no marijuana was found inside the car.

The officers likely were aware that they would have probable cause to search the vehicle if they stated that they detected an odor of marijuana.[29] The Court finds that the officers made their statements in an effort to search the vehicle. The seizure of the weapon was "a fruit" of an unlawful acquisition of the Defendant's license plate. The seizure of the weapon was also the result of a warrantless search done without probable cause.

**CONCLUSION**

---

[28] Government Exhibit 3. Again, it is noted that large portions of the audio are muted by the officers.
[29] "It is well settled that warrantless searches of automobiles are permitted by the Fourth Amendment if the officers have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995). The smell of marijuana alone may constitute probable cause to search a vehicle". *United States v. Young*, 544 F. App'x 276, 277 (5th Cir. 2013); *United States v. Smith*, 596 F. App'x 804, 807 (11th Cir. 2015) (search of car was supported by probable cause because of the smell of marijuana).

9

Defendant's motion to suppress (docket no. 27) and amended motion (docket no. 39) are GRANTED.  Defendant's motion to admit exhibits (docket no. 71) is GRANTED.  Government's motion to exclude (docket no. 76) is DENIED.

SIGNED this 7th day of May, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE